**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Juliet E. Pruden

    v.                                    Civil No. 12-cv-452-LM
                                             Opinion No. 2014 DNH 115

CitiMortgage, Inc.


## O R D E R


In a case that has been removed from the Grafton County Superior Court, and that arises from the manner in which CitiMortgage, Inc. ("CMI") handled various matters related to the servicing of her mortgage, Juliet Pruden asserts claims for: breach of the implied covenant of good faith and fair dealing (Count I), violation of chapter 358-C of the New Hampshire Revised Statutes Annotated ("RSA") (Count II), and negligent infliction of emotional distress (Count III). Before the court is CMI's motion for summary judgment. Pruden objects. The court heard oral argument on May 9, 2014. For the reasons that follow, CMI's motion for summary judgment is granted in part and denied in part.


### Summary-Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Ponte v. Steelcase Inc., 741 F.3d

310, 319 (1st Cir. 2014) (quoting Cortés-Rivera v. Dept. of Corr., 626 F.3d 21, 26 (1st Cir. 2010)); see also Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the court must "view[] the entire record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'"  Winslow v. Aroostook Cty., 736 F.3d 23, 29 (1st Cir. 2013) (quoting Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

"The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Dávila v. Corp. de P.R. para la Diffusión Púb., 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)).  "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)). Thus, "[c]onclusory allegations, improbable inferences, and

unsupported speculation, are insufficient to establish a genuine dispute of fact." Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (quoting Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)). "Rather, the party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his [or her] claim." Sánchez-Rodríguez, 673 F.3d at 9 (quoting Soto-Ocasio v. Fed. Ex. Corp., 150 F.3d 14, 18 (1st Cir. 1998)) (internal quotation marks omitted).

## Background

In accordance with LR 56.1(a), CMI has incorporated into its memorandum "a short and concise statement of material facts, supported by appropriate record citations, as to which [it] contends there is no genuine issue to be tried." Pruden's memorandum in opposition does not include, in its text, the statement of material facts required by LR 56.1(b). Rather, she has attached to her objection an affidavit in which she presents a brief narrative and then takes issue with or elaborates on 26 of the 39 paragraphs in CMI's statements of undisputed facts.[1] However, in her surreply, she backtracks a bit by conceding that the facts in twelve of the paragraphs she had challenged in her affidavit are actually undisputed. Then, while she indicates

---

[1] In addition to stating facts, Pruden's affidavit also includes a fair amount of legal argument.

that she disputes the statements in fourteen paragraphs, she substantively addresses only six of them.[2]  In the face of this unorthodox approach to LR 56.1(b), the court will do its best to outline the undisputed facts of this case.

In June of 2007, Pruden gave a promissory note ("first note") to Cousins Home Lending, Inc. ("Cousins") in exchange for a loan of $345,824.  Repayment of the first note was secured by a mortgage (first mortgage).  Immediately after Pruden gave the first note, it was made payable to CMI, and servicing of the first mortgage was transferred to CMI.  Also in June of 2007, Pruden received a second loan from Cousins, in the amount of $64,800.  She gave Cousins a second promissory note, repayment of which was secured by a second mortgage on the property that secured repayment of the first loan.  The second note and mortgage were transferred from Cousins to CMI under the same terms as the first note and mortgage.  Pruden used the proceeds from both loans to purchase the property that secured her repayment of those loans.

---

[2] Two of those objections are not based upon admissible evidence that runs counter to evidence produced by CMI.  Rather, they simply state that Pruden "is uncertain about the statements in [paragraphs] 37 and 38 because she is not privy to the accounting" on which they are based.  Pl.'s Surreply (doc. no. 51) 1.  The remaining four challenges do not identify record evidence that contradicts evidence produced by CMI but are more in the nature of elaborations that add other evidence to place CMI's evidence in context or to support inference that is contrary to the one CMI would have the court draw from the evidence it produced.

With regard to the first note, it appears to be undisputed that in October of 2008, in anticipation of impending financial difficulties, Pruden contacted CMI to see about modifying her first mortgage before she reached the point of default.  It also appears to be undisputed that the CMI employee with whom Pruden spoke informed her that CMI would not consider a mortgage modification until she had missed three payments.[3]  Based upon that conversation, Pruden missed her next three payments.  By doing so, she defaulted.  After her default, Pruden entered into a forbearance agreement with CMI, signed a temporary repayment plan with a term of six months, and made all the payments required thereunder.

In late September of 2009, Pruden signed a document titled "Home Affordable Modification Trial Period Plan" ("TPP") that had been proffered to her by CMI.  The TPP agreement begins with the following statement:

> If I am in compliance with this Trial Period Plan
> . . . and my representations in Section 1 continue to
> be true in all material respects, then the Lender will
> provide me with a Home Affordable Modification
> Agreement . . . , as set forth in Section 3, that
> would amend and supplement (1) the Mortgage on the
> Property and (2) the Note secured by the Mortgage.

Second Am. Compl., Ex. C (doc. no. 36-3), at 1.  One of the representations in Section 1 states, in pertinent part: "I am

---

[3] As to the purpose and effect of that statement, Pruden says that the CMI employee told her to miss three payments while CMI says that he merely explained to her the circumstances under which it would consider a request to modify a mortgage.

providing or already have provided documentation for **all** income that I receive . . . ." Id. (emphasis in the original).  Pruden made the payments required by her TPP for the full three-month term of that agreement, and continued to make those same payments for approximately five more months.  Then, however, CMI began to rebuff Pruden's attempts to pay anything other than the full payment required under the original note.  In the face of CMI's refusal to accept and/or credit anything other than a full pre-TPP payment, Pruden stopped making payments on her first mortgage in approximately June of 2010.

Pruden's attempt to move from her TPP to a HAMP modification, starting upon the termination of her TPP in December of 2009, has resulted in multiple denials, but, as of yet, no HAMP modification.  With regard to denials, the summary-judgment record includes:

> a letter dated December 16, 2010, that denied Pruden's application for a HAMP modification because it was incomplete, due to Pruden's failure to provide requested documents, see Def.'s Mem. of Law, Ex. A, Pt. 6 (doc. no. 43-7), at 0144-47;
>
> a letter dated August 23, 2011, that identified the income information CMI used in denying Pruden a HAMP modification, see id. at 0150-51;
>
> a letter dated December 23, 2011, signed by Judy Caruso, that denied Pruden's request for reconsideration of a denial of an application for a HAMP modification, see id. at 0153;
>
> a letter dated July 24, 2012, that denied Pruden's application for a HAMP modification, based upon underwriting that demonstrated that her post-

modification debt-to-income ratio fell outside
acceptable guidelines, which require that housing
expenses be less than or equal to 42% of the
borrower's gross income, <u>see</u> <u>id.</u> at 0154-57;

a letter dated July 25, 2012, signed by Ron Mitchell
and providing approximately seven pages of supporting
data and explanation, that denied Pruden's request for
hardship assistance and/or a HAMP modification, on
grounds that CMI was "unable to create an affordable
payment equal to 31% of [her] reported monthly gross
income without changing the terms of [her] loan beyond
the requirements of the program," <u>id.</u> at 0158; <u>see</u>
<u>generally</u> <u>id.</u> at 0158-68;

a letter dated October 22, 2012, that denied Pruden's
application for a Citi Supplemental Modification, on
grounds that "[t]he principal forbearance amount
exceeds the limit available under this program," <u>id.</u>,
Pt. 7 (doc. no. 43-8), at 0175; <u>see generally</u> <u>id.</u> at
0175-76;

a letter dated October 26, 2012, that denied Pruden's
application for a HAMP modification on grounds that
CMI was "unable to create an affordable payment equal
to 31% of [her] reported monthly gross income without
changing the terms of [her] loan beyond the
requirements of the program," <u>id.</u> at 0177; <u>see</u>
<u>generally</u> <u>id.</u> at 0177-78; and

a letter dated November 7, 2012, providing
approximately six pages of supporting data and
explanation, that denied Pruden's request for hardship
assistance and/or a HAMP modification, on grounds that
CMI was "unable to create an affordable payment equal
to 31% of [her] reported monthly gross income without
changing the terms of [her] loan beyond the
requirements of the program," <u>id.</u> at 0181; <u>see</u>
<u>generally</u> <u>id.</u> at 0181-90;

a letter dated November 13, 2012, denying Pruden's
application for a Citi Supplemental Modification on
grounds that "[t]he principal forbearance amount
exceeds the limit available under this program," <u>id.</u>
at 191; <u>see generally</u> <u>id.</u> at 0191-92.

In her surreply, which CMI has moved to strike, Pruden refers to two letters written by CMI in March of 2013. In the first letter, which was sent to Pruden, CMI indicated that it had approved her request for a repayment plan. In the second letter, which was drafted but never sent, CMI indicated that it had approved Pruden for a HAMP modification. While the admissibility of those two letters is the subject of CMI's pending motion to strike, there is nothing in the rules of evidence to preclude the court from observing that those letters may suggest the possibility of a settlement.

Pruden's second amended complaint includes more than 100 paragraphs describing her interactions with CMI, starting in October of 2008. Those interactions have involved more than 30 named employees and any number of other unnamed employees communicating back and forth with Pruden via telephone, FAX, regular mail, and e-mail. The complaint's narrative both describes a process that was cumbersome, unpleasant, and extremely frustrating to Pruden, and also sheds an unflattering light on several different aspects of CMI's basic competence. But, of course, summary judgment does not test the allegations in a plaintiff's complaint; it assays the parties' proof. See Dávila, 498 F.3d at 12. Accordingly, the court turns to the summary-judgment record to describe the relevant details of CMI's handling of Pruden's request for a HAMP modification.

Without specifying dates, Pruden has produced evidence that CMI repeatedly lost documents, failed to ask her to resend them, and then denied one or more of her applications for a mortgage modification because of missing paperwork.  See Pl.'s Obj., Attach. 1, Pruden Aff. (doc. no. 47-1) ¶ 16.  She has also testified, albeit in a somewhat conclusory and/or nonspecific way, that: (1) "CMI drew out the review process, creating an arrearage so great that she could neither cure it, nor combined with the lower property values due to the recession, obtain refinancing to cover the arrearage,"[4] id. ¶ 30; see also id. ¶ 36E; (2) at some unspecified time, both the HAMP Solutions Center and the New Hampshire Banking Commission examined the paperwork Pruden had submitted to CMI "and found inconsistencies in CMI's calculations or other evidence of [its] mishandling of the review," id. ¶ 35;[5] see also id. ¶¶ 16, 38 (more general testimony that CMI's conduct compelled Pruden to call in third parties to assist her); (3) CMI denied her requests to review

---

[4] Regarding how the arrearage became so large that Pruden could not cure it, she testified at her deposition that during the time when she was not making payments on her first mortgage, she was spending money on improvements to the mortgaged property, and that the amount of money she spent on those improvements was approximately the same amount as the mortgage payments she was not making.  See Def.'s Mem. of Law, Ex. A, Pt. 3, Pruden Dep. (doc. no. 43-4) 159:15-160:8, Dec. 12, 2013.

[5] Pruden's affidavit does not cite any documents authored by either the Solutions Center or the Banking Commission stating those conclusions, and the record does not appear to include any such documents.

the information it used to determine her eligibility for a
modification see id. ¶ 36J; (4) CMI took more than 30 days to
review her applications, despite assurances that the review
process should take about 30 days to complete, see id. ¶ 38; and
(5) at some point, Caruso threatened to report Pruden to the IRS
for sending CMI tax returns that were different from those she
had filed with the IRS, see id. ¶ 41.

In addition to the foregoing, Pruden's affidavit includes
more specific evidence that:

> as of May of 2010, CMI had not concluded its review of
> her HAMP application and had stopped considering it,
> on grounds that it was missing documents, see Pl.'s
> Obj., Attach. 1, Pruden Aff. (doc. no. 47-1) ¶ 31;

> between September of 2010, when her account was
> referred to CMI's Executive Response Unit ("ERU"), and
> September of 2012, she did not receive the regular
> communications from CMI she had been promised, CMI
> frequently replaced the employee who was assigned to
> be her designated contact, and she was contacted by
> CMI departments other that the ERU, which had been
> designated as her sole point of contact with CMI; see
> id. ¶ 40;

> the documents CMI said it lacked when it issued its
> December 16, 2010, denial were actually in its
> possession at the time it said it did not have them,
> see id. ¶ 36A, and the HAMP Solutions Center had to
> intervene to help correct CMI's error, see id.;

> Caruso's December 23, 2011, denial of Pruden's request
> for reconsideration was issued just 24 hours after
> Pruden had submitted additional paperwork, see id. ¶
> 36D;

> in connection with December 23 denial, Caruso refused
> to speak with Pruden any further and directed her to
> contact the HAMP Solutions Center instead, see id. ¶
> 38;

Pruden did contact the Solutions Center, which
intervened again on her behalf, see id. ¶ 36D;

the July 24, 2012, denial was based on an erroneous
calculation of her income, see id. ¶ 36E;

CMI's Ron Mitchell would not return her phone calls
and e-mails concerning the income calculation on which
the July 24 denial was based, see id. ¶ 36F;

CMI issued the October 22, denial before it received
additional documentation from Pruden that it knew to
be on the way, see id. ¶ 36G;

CMI issued the October 26 denial before it received
certain necessary documents such as bank statements
and profit-and-loss statements, see id. ¶ 10;

CMI issued the November 7 denial before it received
Pruden's checking-account statements and her profit-
and-loss statements, see id. ¶ 11;

CMI's November 7 letter states that it had relied upon
Pruden's savings statements, while no such statements
ever existed, see id. ¶ 11; and

the income and property-value calculations on which
CMI based its November 7 denial were inconsistent with
previously calculated determinations of her income and
the value of her property, see id. ¶ 36H.

Pruden has also produced evidence of other objectionable conduct

by CMI, but that conduct is either described in a conclusory

way, see Travers, 737 F.3d at 146, or is conduct that took place

while CMI was carrying out activities other than considering

Pruden's request for a HAMP modification, such as handling her

second mortgage and her default on her first mortgage.

With regard to a month's worth of "pesky hang-up phone

calls" Pruden alleges she received from CMI, it is undisputed

that Pruden "never spoke to an individual or individuals who allegedly made" them, Def.'s Mem. of Law (doc. no. 43-1) ¶ 34. But, Pruden has produced undisputed evidence that after each hang-up call, her caller-identification device displayed the same telephone number, and that when she called that number on numerous occasions, she reached CMI's collections department. See Pl.'s Obj., Attach, 1, Pruden Aff. (doc. no. 47-1) ¶ 41.

Turning briefly to the second note, in the spring of 2009, CMI granted Pruden a modification of her second mortgage.  In December of 2012, CMI erroneously placed a charge of $84 on her second-mortgage account, but then corrected its mistake.[6]  Pruden stopped making payments on the second mortgage in January of 2013, and has made no payments since then.

On November 12, 2012, Pruden filed an action in the Grafton County Superior Court seeking to enjoin the sale of her house at a foreclosure auction.  After the case was removed to this court, Pruden filed two amended complaints.  In the second one, filed on May 15, 2013, Pruden asserts claims for breach of the implied covenant of good faith and fair dealing, violation of RSA ch. 358-C, and negligent infliction of emotional distress.

---

[6] CMI states, as an undisputed fact, that it corrected its mistake "promptly."  Def.'s Mem. of Law (doc. no. 43-1) ¶ 12. In her surreply, Pruden takes issue, pointing to her testimony that it took CMI two months to correct its mistake and that it did not do so until she filed a complaint with the Office of the Comptroller of the Currency.

**Discussion**

CMI moves for summary judgment on each of Pruden's three claims.  The court discusses each in turn.

A. Count I: Implied Covenant of Good Faith and Fair Dealing

In Count I, Pruden claims that CMI breached the implied covenant of good faith and fair dealing by engaging in a "pattern of repeated and deliberate mishandling of her account, careless pursuit of foreclosure, false reporting to credit bureaus, and failure to properly process her applications for a loan modification."  Second Am. Compl. (doc. no. 36) ¶ 138.  As for relief, she "seeks an order from this Court compelling [CMI] to properly process a loan modification application, to document and disclose all calculations used by underwriting, and to fully explain a properly formulated decision."  Id. ¶ 139.  CMI argues that it is entitled to summary judgment because the implied covenant on which Pruden relies did not require it to modify her loan.  Plaintiff responds by pointing out that the conduct on which Count I is based is not CMI's failure to give her a loan modification but, rather, CMI's "deliberate or indifferent mishandling of her applications over the years."  Pl.'s Mem. of Law (doc. no. 47-25) 5.

In New Hampshire, "[i]n every agreement, there is an implied covenant that the parties will act in good faith and fairly with one another."  Birch Broad., Inc. v. Capitol Broad.

Corp., 161 N.H. 192, 198 (2010) (citing Livingston v. 18 Mile
Point Drive, Ltd., 158 N.H. 619, 624 (2009)).  Of the three
categories of good-faith duties implied into every New Hampshire
contract, Pruden relies upon one: the parties' obligation to act
fairly when exercising their discretion in performing under
their agreement.  See Birch Broadcasting, 161 N.H. at 198.  As
for the contours of that obligation, the New Hampshire Supreme
Court has described the applicable rule:

> [U]nder an agreement that appears by word or silence
> to invest one party with a degree of discretion in
> performance sufficient to deprive another party of a
> substantial proportion of the agreement's value, the
> parties' intent to be bound by an enforceable contract
> raises an implied obligation of good faith to observe
> reasonable limits in exercising that discretion,
> consistent with the parties' purpose or purposes in
> contracting.

Centronics Corp v. Genicom Corp., 132 N.H. 144, 143 (1989).
While that rule "is comparatively narrow, its broader function
is to prohibit behavior inconsistent with the parties' agreed-
upon common purpose and justified expectations as well as 'with
common standards of decency, fairness and reasonableness,'"
Birch Broadcasting, 161 N.H. at 198 (quoting Livingston, 158
N.H. at 624)).

Here, Pruden's implied-covenant claim cannot get off the
starting line because the agreement that Pruden identifies as
incorporating the implied covenant on which she is suing, i.e.,
the first note and mortgage, did not vest CMI, or its

predecessors in interest, with any discretion in performance.
As the New Hampshire Supreme Court explained in Centronics:

> A claim for relief from a violation of the implied
> covenant of good faith contractual performance
> therefore potentially raises four questions:
>
> > 1. Does the agreement ostensibly allow to or
> > confer upon the defendant a degree of discretion
> > in performance tantamount to a power to deprive
> > the plaintiff of a substantial proportion of the
> > agreement's value?

132 N.H. at 143-44.  Under the note and mortgage, Cousins' only
promised performance was to lend Pruden a sum of money, and the
agreement does not appear to have conferred any discretion upon
Cousins with regard to its performance of that obligation.
Moreover, regardless of the amount of discretion the agreement
may have conferred upon Cousins, any such discretion had been
exercised before CMI ever entered the picture because, at the
time CMI acquired the note and mortgage, Cousins had fully
performed all the obligations on its side of the agreement.
That is, before CMI acquired the note and mortgage, Pruden had
received everything she was due under that agreement.  Thus, CMI
was never in a position to deprive Pruden of any of the
agreement's value, much less a substantial proportion of it.
Accordingly, CMI is entitled to judgment as a matter of law on
Pruden's claim under the implied covenant of good faith and fair
dealing.  Cf. Farah v. Fed. Nat'l Mortg. Ass'n, No. 13-CV-11787,
2014 WL 1305069, at *4 (E.D. Mich. Mar. 31, 2014) ("Because the

implied duty of good faith and fair dealing must relate to an actual underlying contract, rather than negotiations to modify a contract, Plaintiffs have failed to state a breach of contract claim based on the implied duty of good faith and fair dealing.").

In her surreply, Pruden cites Young v. Wells Fargo Bank, N.A. for the proposition that, under the right circumstances, a borrower in her position could maintain a claim for breach of the implied covenant of good faith and fair dealing based upon a covenant implied into a TPP, see 717 F.3d 224, 237-39 (1st Cir. 2013).  Here, however, that legal principal is inapplicable, given that Pruden's surreply is the first indication that she might be basing Count I upon a covenant implied into her TPP rather than one implied into her first note and mortgage.  There might even be sufficient evidence in this case to go to trial on an implied-covenant claim based upon CMI's conduct in responding to Pruden's attempts to move from her TPP to a HAMP modification – a matter on which the court offers no opinion – Pruden cannot avoid summary judgment based upon a legal claim first introduced in a surreply.

### B. Count II: RSA ch. 358-C

In Count II, Pruden claims that CMI violated four separate provisions of RSA ch. 358-C, New Hampshire's Unfair, Deceptive or Unreasonable Collection Practices Act ("UDUCPA").  CMI moves

for summary judgment on grounds that: (1) foreclosure is not collection activity under the UDUCPA; and (2) Pruden can present no admissible evidence that it engaged in any of the acts prohibited by the UDUCPA.[7]  Pruden disagrees, categorically. CMI's second argument is partially meritorious.

The UDUCPA provides, as a general prohibition, that "[n]o debt collector shall collect or attempt to collect a debt in an unfair, deceptive or unreasonable manner as defined in this chapter."  RSA 358-C:2.  Thus,

> [t]o recover under . . . the UDUCPA, [Pruden] must show that: "(1) [she has] been the object of collection activity arising from a consumer debt; (2) the defendant attempting to collect the debt qualifies as a 'debt collector' under the Act; and (3) the defendant has engaged in a prohibited act or has failed to perform a requirement imposed by the [Act]." Beadle v. Haughey, [No. Civ. 04-272-SM] . . ., 2005 WL 300060[, at *2] (D.N.H. Feb. 9, 2005); see also, e.g., Gilroy v. Ameriquest Mortg. Co., 632 F. Supp. 2d 132, 134–37 (D.N.H. 2009).

Moore v. Mortg. Elec. Reg. Sys., Inc., 848 F. Supp. 2d 107, 124 (D.N.H. 2012).  Regarding the third element of a UDUCPA claim, the statute describes twelve different prohibited acts, see RSA 358-C:3, four of which figure into Pruden's claims in this case.

The court begins by considering the first element of Pruden's claim and then turns to the third element.

---

[7] At oral argument, CMI gave up a third contention, i.e., that it is not a debt collector within the meaning of the UDUCPA.

1. Nature of CMI's Activities

CMI argues that it cannot be liable to Pruden under the UDUCPA because none of the acts that form the basis for her claims were collection activities.  The court cannot agree.

In support of its motion for summary judgment, CMI has produced evidence that: (1) in a letter from CMI to Pruden dated December 15, 2008, CMI noted "the serious nature of the default in [her] payments," Def.'s Mem. of Law, Ex. A, Pt. 5 (doc. no. 43-6), at 0133,[8] and also included the following notation: "This is an attempt to collect a debt . . . ." id.; and (2) CMI sent Pruden at least four more letters or other documents that included some version of a statement that the letter was "an attempt to collect a debt," see id. at 0138 (Pruden's TPP, executed on Sept. 25, 2009); id., Ex. A, Pt. 9 (doc. no. 43-8), at 0175 (letter of Oct. 22, 2012, denying Pruden's request for a Citi Supplemental Modification), 0177 (letter of Oct. 26, 2012, denying Pruden's request for a HAMP modification), and 0191 (letter of Nov. 13, 2012, denying Pruden's request for a Citi Supplemental Modification).  To paraphrase Judge Laplante's order in Moore, "[f]or [CMI] to argue that it was not engaged in debt collection is, to put it charitably, unsupportable," 848 F. Supp. 2d at 125 (citing Pettway v. Harmon Law Offices, P.C., No.

---

[8] The page numbers used in citations to parts of Exhibit A other than Pruden's deposition are those that appear at the bottom of each page, in the center.

03-CV-10932-RGS, 2005 WL 2365331, at *5 & n.10 (D. Mass. Sept. 27, 2005)) ; Maxwell v. Fairbanks Capital Corp. (In re Maxwell), 281 B.R. 101, 119 (Bankr. D. Mass. 2002)).  After having represented its activities on so many occasions as debt collection, CMI cannot now retreat from that characterization of what it was doing when it was dealing with Pruden.

### 2. The Merits

Having rejected CMI's argument that it did not engage in collection activities in its dealings with Pruden, the court turns to CMI's argument that the eleven factual bases for the claims Pruden asserts in Count II are not prohibited acts under RSA 358-C:3.  Rather than proceeding in the order in which CMI's conduct is discussed in Pruden's second amended complaint, the court organizes its discussion on the basis of the four prohibited acts for which Pruden seeks to hold CMI liable.

### a. RSA 358-C:3, I(a)

The UDUCPA describes the first prohibited act on which Pruden bases count II as "causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously or at unusual times or at times known to be inconvenient with the intent to abuse, oppress or harass any person at the called number."  RSA 358-C:3, I(a).  With regard to the elements of her claim, Pruden

19

must prove that: (1) [CMI], in an "attempt to collect
a debt"; (2) orally communicated or attempted to
orally communicate with her "by causing a telephone to
ring[,] or engaging [her] in telephone conversa-
tion[s]"; (3) "repeatedly or continuously or at
unusual times or at times known to be inconvenient";
(4) "with the intent to abuse, oppress or harass" her.
RSA 358-C:3, I(a).

Gilroy, 632 F. Supp. 2d at 134.

Pruden claims that CMI violated RSA 358-C:3, I(a), by
"engag[ing] in a campaign of calling [her] twice daily for a
period of about a month, as detailed in paragraph 83."  Second
Am. Compl. ¶ 155.  Paragraph 83, in turn, makes the following
allegation:

> Pruden then received several calls from the [CMI]
> Collections Department.  Pruden repeatedly informed
> these employees that her loan modification request was
> under review by the [CMI] Executive Response Unit and
> that any communications from [CMI] should come from
> that office.  The collections calls were received
> twice daily until they ceased after about a month.
> During this time, Pruden did not receive any
> communication from the [CMI] Executive Response Unit.

Id. ¶ 83.  At her deposition, Pruden testified that between mid
August and mid September of 2012, she received at least one
"hang-up" call each day from the CMI collections department.
See Def.'s Mem. of Law, Ex. A, Pt. 2, Pruden Dep. (doc. no. 43-
3) 125:23–130:18, Dec. 12, 2013.

CMI moves for summary judgment on this component of Count
II, arguing that Pruden cannot prove that she received the calls
in the first place or that they originated from the CMI
collections department.  The court does not agree.  A reasonable

factfinder could conclude, from Pruden's own testimony, as
reflected in her deposition, that she received at least 30 hang-
up calls over the course of approximately one month.  A
reasonable factfinder could also conclude that the calls came
from CMI's collections department, given Pruden's testimony that
she recognized the telephone number displayed by her caller-
identification device as being the number of the CMI collections
department, see Pruden Dep. 128:6, and that when she called that
number she reached the CMI collections department, see id.
128:8-11; Pl.'s Obj., Attach. 1, Pruden Aff. (doc. no. 47-1) ¶
41.

The real battle concerns the fourth element of Pruden's
claim, i.e., whether CMI made those calls with the intent to
abuse, oppress, or harass her.  In the context of a claim under
the federal Fair Debt Collection Practices Act ("FDCPA"), the
jurisprudence of which is relevant to deciding claims under the
UDUCPA, see Gilroy, 632 F. Supp. 2d at 136, Judge Sargus
explained that ordinarily, it is for the factfinder to determine
whether a debt collector's conduct evinces an intent to abuse,
oppress, or harass a debtor, see Durthaler v. Accounts
Receivable Mgmt., Inc., 854 F. Supp. 2d 485, 488 (S.D. Ohio
2012) (quoting Harvey v. Great Seneca Fin. Corp., 453 F.3d 324,
330 (6th Cir. 2006); citing Jeter v. Credit Bureau, 760 F.2d
1168, 1179 (11th Cir. 1985)).  Moreover, "courts [are to]

consider whether 'the nature of telephone calls, including their frequency, substance, or the place to which they are made, provides grounds to infer [a] debt collector's intent to annoy, abuse, or harass without any other evidence of a debt collector's motive in calling." Durthaler, 854 F. Supp. 2d at 489 (quoting Brown v. Hosto & Buchan, PLLC, 748 F. Supp. 2d 847, 852 (W.D. Tenn. 2010)).  That is, in addition to the sheer number of calls, "the nature, extent, and context of the calls are also important" considerations when inferring a debt collector's intent. Durthaler, 854 F. Supp. 2d at 491 (quoting Hicks v. Am.'s Recovery Solutions, LLC, 816 F. Supp. 2d 509, 515 (N.D. Ohio 2011)).

At oral argument, CMI devoted considerable attention to its argument that this case involves fewer telephone calls than several other cases in which courts declined to infer an intent to harass.  And, indeed, "[a] remarkable volume of telephone calls is permissible under FDCPA jurisprudence." Zortman v. J.C. Christensen & Assocs., Inc., 870 F. Supp. 2d 694, 707 (D. Minn. 2012) (citations omitted).  However, "[c]ourts generally agree that there is no bright line rule regarding the number of calls which creates the inference of intent." Durthaler, 854 F. Supp. 2d at 489 (quoting Hicks, 816 F. Supp. 2d at 515) (internal quotation marks and brackets omitted).  The problem

with CMI's reliance upon its call-counting cases is that none of them appear to involve the kind of calls at issue here.

CMI argues that the fact that Pruden is complaining about hang-up calls works in its favor, because the silence of the people who made those calls makes it impossible to infer their intent. To be sure, the FDCPA hang-up-call jurisprudence includes cases ruling that: (1) no intent to harass could be inferred when a defendant produced undisputed evidence that automated hang-up calls "were the unintended product of software used to avoid leaving a message on an answering machine," Isaac v. RMB, Inc., No. 2:12-cv-2030-TMP, 2014 WL 1278096, at *5 (N.D. Ala. Mar. 27, 2014); (2) a debt collector did not incur liability under FDCPA provisions requiring debt collectors to identify themselves, and to identify themselves as debt collectors, when it placed the equivalent of a hang-up call to an answering machine, resulting in twenty-seconds of dead air, see Garza v. MRS BPO, LLC, Civ. Action No. H-12-1057, 2012 WL 3527072, at *2-3 (S.D. Tex. Aug. 15, 2012); (3) for purposes of the FDCPA, "[a] hang-up call is not a communication," Zortman, 870 F. Supp. 2d at 706; and (4) "it is clear that not leaving a message [on a debtor's voice mail] is not the type of harassing, oppressive, or abusive conduct that violates the [FDCPA]," Druschel v. CCB Credit Servs., Inc., No. 8:10-cv-838-T-33TBM, 2011 WL 2681637, at *7 (M.D. Fla. June 14, 2011) (quoting Waite

v. Fin. Recovery Servs., Inc., No. 8:09-cv-02336-T-33AEP, 2010
WL 5209305 n.9 (M.D. Fla Dec. 16, 2010); citing Udell v. Kan.
Counselors, Inc., 313 F. Supp. 2d 1135, 1143 (D. Kan. 2004).
And there is even a case in which a court has ruled that absent
"evidence such that a reasonable juror could conclude that
[hang-up] calls were caused by [a debt collector] with an intent
to harass . . . [the debtor's] mere allegations of hang up calls
[was] insufficient to survive summary judgment." Bey v. Daimler
Chrysler Servs. of N. Am., LLC, No. Civ. 04-6186(RBK), 2006 WL
361385, at *10 (D.N.J. Feb. 15, 2006).

On the other hand, in Langdon v. Credit Management, LP,
Judge Walker determined that the plaintiff had stated a claim
under the FDCPA equivalent of RSA 358-C:3, I(a), by alleging
that a debt collector "constantly and continuously placed
collection calls, often placed two (2) or more collection calls
in a single day and [hung] up the phone when Plaintiff or the
answering machine answer[ed]," No. C 09-3286 VRW, 2010 WL
3341860, at *2 (N.D. Cal. Feb. 24, 2010) (brackets, ellipses,
and citation to the record omitted). And, in Carman v. CBE
Group, Inc., Judge Robinson identified deliberate hang-up calls
as potentially harassing conduct under the FDCPA, see 782 F.
Supp. 2d 1223, 1232 (D. Kan. 2011).

Here, the court has no difficulty determining that a
reasonable factfinder could infer an intent to harass from

Pruden's deposition testimony that she received at least 30
hang-up calls from CMI over the course of a month.  When a debt
collector calls a debtor and says something about the debt, that
is evidence that the intent behind the call is to collect the
debt.  But no such presumption of a permissible intent attaches
to a hang-up call.  The only reasonable inference of intent that
may be drawn concerning a deliberate hang-up call is that the
caller intended to vex the person he or she was calling.  Where,
as here, Pruden has produced undisputed evidence that she
received at least 30 telephone calls that could have had no
purpose other than to harass her, CMI has failed to demonstrate
that Pruden cannot establish the fourth element of her claim
under RSA 358-C:3, I(a).

With regard to the third element of Pruden's claim, which
pertains to repeated or continuous telephone calls, "the term
repeatedly means calling with excessive frequency under the
circumstances . . . ."  Durthaler, 854 F. Supp. 2d at 489
(quoting Hicks, 816 F. Supp. 2d at 515; citing McVey v. Bay Area
Credit Serv., No. 4:10-CV-359-A, 2010 WL 2927388, at *6 (N.D.
Tex. July 26, 2010); Federal Trade Comm'n Staff Commentary on
the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097))
(internal quotation marks omitted).  CMI does not appear to
contest Pruden's ability to establish the third element of her
claim but, to the extent it does, the court's analysis of the

fourth element is dispositive.  Given the court's determination that there can be no good purpose for a deliberate hang-up call, virtually any number of such calls would be excessive under the circumstances.

Accordingly, CMI is not entitled to judgment as a matter of law on the portion of Count II that asserts a claim under RSA 358-C:3, I(a).

### b. RSA 358-C:3, III

The second prohibited act on which Pruden bases a claim is "[t]hreaten[ing] to take any unlawful action or action which the debt collector in the regular course of business does not take." RSA 358-C:3, III.   Pruden asserts that CMI made two separate threats that run afoul of RSA 358-C:3, III.   The court considers each in turn.

**July 15, 2010, demand letter.**  By letter dated July 15, 2010, CMI informed Pruden that it had previously sent her a letter of default, that she had yet to cure the default, that the deadline for doing so was approaching, and that if she failed to do so, CMI would sent her account to an attorney to begin foreclosure proceedings.  See Am. Compl., Ex. 12 (doc. no. 14-13).  Pruden claims that

> when [she] received the demand letter dated July 15, 2010 . . . the statement that the note would be accelerated and foreclosure proceedings would commence was a threat to take unlawful action or action which the debt collector in the regular course of business

26

> does not take since she was involved in a repayment
> plan and should not have been deemed to be in default.

Second Am. Compl. ¶ 151.  CMI argues that it is entitled to

summary judgment on this component of Count II because it is

undisputed that when it sent the demand letter, Pruden was in

default, and Pruden has identified no authority for the

proposition that, at the time CMI sent the letter, it would have

been unlawful for it to foreclose on Pruden's mortgage.  In her

objection, and without citing any legal authority, Pruden

responds:

> The fact that Pruden had not made a payment in
> previous years does not take away from the fact that
> Pruden was in a repayment plan with CMI.  As a result,
> the demand letter dated July 15, 2010, accelerating
> the note and commencing foreclosure proceedings was a
> threat to take unlawful action or action which the
> debt collector in the regular course of business does
> not take.

Pl.'s Mem. of Law (doc. no. 47-25) 14-15.  The court does not

agree.

To begin, the July 15 letter neither accelerated the note

nor commenced foreclosure proceedings.  Moreover, Pruden was not

in a repayment plan with CMI as of July 15, 2010.  She had

entered a forbearance agreement with CMI that covered the first

six months of 2009, had a TPP that ran for approximately the

last three months of 2009, and had been under consideration for

a HAMP modification since early 2010.  But, in July of 2010,

Pruden was not operating under any repayment plan.  Moreover,

Pruden has identified no authority for the proposition that under the circumstances of this case, the July 15 letter threatened unlawful action.

Finally, as to the second basis for potential liability, threats to take action that CMI does not take in the regular course of business, neither side has produced any evidence. But, Pruden herself has produced the TPP which specifies, among other things, that: (1) CMI agreed to suspend foreclosure activities during the term of the TPP but reserved the right to resume them upon termination of the TPP; (2) by accepting payments under the TPP, CMI did not waive its right to accelerate the loan or foreclose upon the property securing the mortgage; and (3) all of the terms of the note and mortgage remained in full force and effect.  See Pl.'s Obj., Attach. 7 (doc. no. 47-7), at 2-3.  Thus, there would appear to be no basis for a claim that CMI threatened, in the July 15 letter, to take action that it does not take in the regular course of its business.

Accordingly, as to this component of Count II, CMI is entitled to judgment as a matter of law.

**July 23, 2012, application packet cover letter**.  Pruden claims that

> [w]hen [CMI] informed [her] that foreclosure
> proceedings may proceed simultaneously with the HAMP
> evaluation . . . this was a threat to take unlawful
> action or action which the debt collector in the

> regular course of business does not take, in violation
> of NH RSA 358-C:3, VII.

Second Am. Compl. ¶ 156.  While Pruden cites RSA 358-C:3, VII, the conduct she identifies as the basis for her claim is conduct prohibited by RSA 358-C:3, III, rather than 358-C:3, VII.  The court proceeds accordingly.

In its motion for summary judgment on this component of Count II, CMI understood Pruden to be basing her claim on an allegedly false statement, in violation of RSA 358-C:3, VII, but at oral argument, it recognized the claim to be one for making a threat to take unlawful action, in violation of RSA 358-C:3, III.  Pruden does not address the June 23 letter in her objection to summary judgment.

Pruden is not entitled to bring this component of Count II to trial.  Neither the second amended complaint nor Pruden's objection to summary judgment includes a citation to the July 23 letter, the court has been unable to locate it in the summary-judgment record, and Pruden says nothing about it in her affidavit.  In other words, there is simply no evidence to present to a factfinder.  Accordingly, CMI is entitled to judgment as a matter of law on this component of Count II.

### c. RSA 358-C:3, VII

The majority of Pruden's statutory claims are based upon the prohibition against "[m]ak[ing] any material false

29

representation or implication of the character, extent or amount of [a] debt, or of its status in any legal proceeding." RSA 358-C:3, VII.  Pruden claims that CMI made seven different false representations.

CMI argues that it is entitled to summary judgment on all seven of the false-statement claims in Count II because Pruden does not challenge the accuracy of its statements but, rather, challenges its right to send her letters concerning the possibility of foreclosure while it was reviewing her applications for mortgage modifications.  Pruden objects in a similarly generalized way, contending that while a borrower is under consideration for a HAMP modification, letters concerning foreclosure are forbidden by a HAMP directive that was promulgated by the U.S. Department of the Treasury.[9]  In Pruden's view, any statement by a mortgage servicer to a borrower during the course of a HAMP evaluation that mentions default or the possibility of foreclosure is necessarily a false representation within the meaning of RSA 358-C:3, VII.  She concludes: "Since Pruden's loan should not have been in the default status, CMI's communication through demand letters was a false or [sic] material misrepresentation regarding the 'character, extent, or

---

[9] The directive Pruden quotes in her memorandum of law does not forbid communications concerning foreclosure; it says that "servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program . . . ." Doc. no. 47-25, at 15.

30

amount' of Pruden's debt."  Pl.'s Mem. of Law (doc. no. 47-25)
16.  At oral argument, CMI moved beyond its generalized position
and made specific arguments concerning each of the allegedly
false statements at issue.

   **Statement of default and threat of foreclosure.**  Pruden
claims: "Each time [CMI] informed [her] that she was in default
and that foreclosure was imminent when she was participating in
a [CMI] arranged payment plan [that information was] a material
false representation or implication of the character, extent or
amount of a debt, or of its status in any legal proceeding."
Second Am. Compl. ¶ 146.  CMI says that the statements to which
Pruden refers in that paragraph are all true.  Be that as it
may, paragraph 146 of Pruden's second amended complaint lacks
the specificity necessary to state a claim.  See Katz v.
Pershing, LLC, 672 F.3d 64, 73 (1st Cir. 2012) (citation
omitted).  Beyond that, in her objection to summary judgment,
she has produced no evidence that would create a triable issue
of fact.  See Sánchez-Rodríguez, 673 F.3d at 9.  Accordingly, as
to this component of Count II, CMI is entitled to judgment as a
matter of law.

   **April 30, 2009, demand letter.**  In a letter dated April 30,
2009, which fell midway through the term of Pruden's forbearance
agreement, CMI notified Pruden that her mortgage account was
still delinquent and asked her to pay a balance due of

$13,591.21 plus $45 in delinquency fees.  See Am. Compl., Ex. 11
(doc. no. 14-12).  Pruden claims: "By sending [her] a demand
letter to pay $13,591, including $45 in delinquency expenses
when she was in full compliance with the six-month payment plan
. . . [CMI] . . . made a material false representation or
implication of the character, extent, or amount of [her] debt."
Second Am. Compl. ¶ 147.

    Pruden's claim fails because the allegedly false
representation was not false, based upon the following provision
in the forbearance agreement:

> You will continue to receive collection letters,
> however, as long as you make forbearance payments
> according to the schedule on this letter you may
> disregard those letters.  . . .  The loan will remain
> in a delinquent status until the payments under this
> Forbearance agreement are made in full.

Def.'s Mem. of Law, Ex. A, Pt. 5 (doc. no. 43-6), at 0134.
Because the forbearance agreement plainly stated that Pruden's
loan would remain in a delinquent status until the payments
thereunder were made in full, CMI did not make a false statement
by telling Pruden, during the term of the forbearance agreement,
that her loan was delinquent.  No matter how confused or alarmed
Pruden may have been when she received the April 30 demand
letter, the forbearance agreement provided ample warning that
she would continue to receive collection letters during the term
of the agreement.  Because Pruden's loan was delinquent when she

received a letter from CMI telling her so, CMI is entitled to
judgment as a matter of law on this component of Count II.

**October 1, 2009, letter.**  Pruden claims that in a letter
dated October 1, 2009, a date that coincided with the starting
date of her TPP, she "was wrongfully informed that her mortgage
account was delinquent; that the payment due on October 1, 2009
had not been received; and that she owed $24,964, including a
delinquency fee of $120 [which] was a material misstatement of
the character, extent, or amount of [her] debt."  Second Am.
Compl. ¶ 148.  At oral argument, CMI contended that none of the
statements alleged in paragraph 148 were false.  This component
of Count II faces an even more fundamental problem.  Pruden has
not produced the letter on which this claim is based, and the
court could locate neither: (1) the letter itself; nor (2) any
mention of it in Pruden's affidavit.  Accordingly, Pruden has
failed to produce evidence sufficient to take a claim based upon
the October 1 letter to the factfinder.  That entitles CMI to
judgment as a matter of law on this component of Count II.

**November 20, 2009, letter.**  Pruden claims that on November
20, 2009, she received a letter from CMI telling her that
"because she had not kept the terms of the forbearance plan with
us, we have cancelled it," Second Am. Compl. ¶ 149, and that
because "she was fully performing the plan then in effect, [the
foregoing] statement was a false representation or implication

33

of the character, extent or amount of [her] debt," id. ¶ 150.
CMI is entitled to judgment as a matter of law on this claim for
the same reasons that apply to the claim based upon the October
1 letter.[10]

**Statement that CMI could not stop the foreclosure sale.**
Pruden claims: "By stating that [CMI] could not stop the
foreclosure sale and that only the Harmon Law Office had that
ability, [CMI] made a material false representation or
implication of the character, extent, or amount of [her] debt,
or of its status in any legal proceeding."  Second Am. Compl. ¶
152.  Pruden does not indicate why the foregoing statement was
false but, more importantly, has produced no evidence that
anyone from CMI ever even made it.  Because there is no
trialworthy issue, CMI is entitled to judgment as a matter of
law on this component of Count II.

**Denial of Pruden's request for modification.**  By letter
dated December 16, 2010, CMI denied Pruden's application for a
HAMP modification, and explained that it was "unable to offer

---

[10] Having determined that CMI is entitled to judgment as a
matter of law due to Pruden's failure to produce any evidence
concerning the content of the October 1 and November 20 letters,
the court recognizes the possibility of a viable claim arising
from those letters.  That is, they could have been worded in a
way that falsely implied that the character of Pruden's debt was
that it was subject to satisfaction through immediate
foreclosure rather than being subject to delayed satisfaction in
the form of foreclosure only upon termination of Pruden's TPP.
But without the necessary evidence, the court's ability to
envision a viable claim is insufficient to stave off summary
judgment.

[her] a Home Affordable Modification because [she] did not provide [CMI] with the documents [it] requested." Am. Compl., Ex. 14 (doc. no. 14-15), at 1.  Pruden claims: "By denying [her] request for loan modification because she did not provide the requested documents . . . [CMI] made a material false representation of the status of [her] debt in a legal proceeding."  Second Am. Compl. ¶ 153.

Because CMI's review of Pruden's application for a HAMP modification was not a legal proceeding, nothing CMI said about that application had anything to do with the status of a debt in a legal proceeding.  However, even if Pruden's application for a HAMP modification had been a legal proceeding, CMI said nothing false about its status.  The status of the application was that it was denied.  The validity of the denial has no bearing on the accuracy of CMI's statement that the application had been denied.  In other words, if the application had been invalidly denied, that would not falsify CMI's statement that the application had, in fact, been denied.

The bottom line is this: CMI is entitled to judgment as a matter of law on this component of Count II.

**Conflicting reports.**  Pruden claims: "By providing conflicting reports of whether the case was opened or closed . . . [CMI] made a material false representation of the status of [her] debt in a legal proceeding."  Second Am. Compl. ¶ 154.

Pruden does not appear to have produced any evidence regarding the conflicting reports on which the claim in paragraph 154 is based, and she does not direct the court to any.  Beyond that, the status of her application for a HAMP modification had nothing to do with the status of a debt in a legal proceeding. CMI is entitled to judgment as a matter of law on this component of Count II.

### d. RSA 358-C:3, X

The final prohibited act on which Pruden bases a claim is "[c]ollect[ing] or attempt[ing] to collect any interest or other charge, fee or expense incidental to the principal obligation unless such interest or incidental fee, charge or expense is expressly authorized by the agreement creating the obligation and legally chargeable to the debtor."  RSA 358-C:3, X.

The summary-judgment record includes undisputed evidence that: (1) as of December of 2012, Pruden was current on her second mortgage; (2) a statement of account activity pertaining to that mortgage, that was dated December 17, 2012, listed "delinquency expenses" of $84, see Pl.'s Obj., Attach. 11 (doc. no. 47-11); (3) the statement defines "delinquency expenses" as "third-party expenses such as property inspection fees, property preservation costs, appraisal costs, and attorney fees incurred by CMI as a result of default," id.; (4) in a letter dated December 28, sent in response to Pruden's inquiry about those

36

expenses, CMI told Pruden the charge was valid, see id., Attach.
13 (doc. no. 47-13); (5) the charge was removed from Pruden's
account in late February of 2013, see Pl.'s Obj., Attach. 1,
Pruden Aff. (doc. no. 47-1) ¶ 25; and (6) by letter dated March
11, CMI informed Pruden that it should not have charged her the
$84 fee, see id., Attach. 16 (doc. no. 47-16).  In addition,
Pruden has produced evidence that, at some point, a CMI employee
told her over that phone "that there should not have been an
appraisal ordered since [her] account was current and not in
default."  Pl.'s Obj., Attach. 1, Pruden Aff. (doc. no. 47-1) ¶
24.

    The court also notes that throughout the process of
resolving this issue, CMI treated the $84 charge as a bit of a
moving target by: (1) referring to it as a delinquency expense
in the December 17 notice; (2) telling Pruden, in a telephone
conversation, that the charge was for an appraisal; and (3)
telling Pruden, in a letter dated March 11, "that the fee that
was assessed was not for a delinquency fee[] or an appraisal fee
as you suggested in your complaint [to the Consumer Financial
Protection Bureau]  but rather [was for] a Broker Price
Opinion," Pl.'s Obj., Attach. 16 (doc. no. 47-16).

    Getting back to the legal question at hand, Pruden claims
that "[w]hen [CMI] added a delinquency charge of $84.00 to [her]
second mortgage account, which account was in good standing

. . ., [CMI] was collecting or attempting to collect a charge, fee, or expense incident to the principal obligation which was not legally chargeable to the debtor, in violation of NH RSA 358-C3, X." Second Am. Compl. ¶ 157. CMI appears to concede that its conduct violated RSA 358-C:3, X, and the undisputed evidence fully supports such a concession. Even so, CMI argues that it is entitled to summary judgment on this component of Count II because it immediately acknowledged its mistake and corrected it. The court does not agree.

CMI appears to rely upon one of the two affirmative defenses available under the UCUCPA:

> [A] debt collector shall not be held liable in any action brought under this chapter for a violation if the debt collector shows by a preponderance of the evidence that:
>
>> (a) The violation was a result of a computation error in billing and within 15 days of notification or discovery of said error the debt collector notified the debtor of such error and corrected such error.

RSA 358-C:4, II. That defense does not entitle CMI to judgment as a matter of law for several reasons. First, the defense is available to a debt collector whose "violation was a result of a computation error in billing" (emphasis added). Here, the error was not one of computation. This is not a case in which CMI charged Pruden's account with a delinquency fee of $84 when it should have charged her a different amount. Rather, by its own admission, CMI should not have charged Pruden any delinquency

fee at all.  Moreover, RSA 358-C:4, II(a), gives debt collectors
15 days to acknowledge <u>and</u> correct a computation error and here,
when the 15-day window closed, at least some CMI employees were
still adhering to the erroneous position that the $84 fee had
been properly charged to Pruden's account and, in any event,
even if some CMI employee did acknowledge, within the 15-day
window, that CMI should not have charged Pruden for an
appraisal, it is undisputed that the error was not corrected
until sometime in February, long after the 15-day window had
closed.  Accordingly, CMI's affirmative defense fails.  That, in
connection with its apparent concession on the elements of a
claim under RSA 358-C:3, X, means that CMI is not entitled to
judgment as a matter of law on this component of Count II.

<u>e. Count II Summary</u>

Based upon the foregoing, CMI is entitled to judgment as a
matter of law on some but not all of the claims Pruden asserts
in Count II.  Specifically, Pruden has survived summary judgment
on her claims under RSA 358-C:3, I(a) (telephone calls) and RSA
358-C:3, X (attempting to collect unauthorized expense).

<u>C. Negligent Infliction of Emotional Distress</u>

In Count III, Pruden claims that she suffered emotional
distress as a result of CMI's breaching various duties it owed
her, including duties: (1) "of reasonable care to treat [her]

with respect, reasonable punctuality, and accuracy, including compliance with banking industry standards," Second Am. Compl. ¶ 160; (2) "to safeguard and maintain a file of sensitive financial data [and] to retrieve and carefully consider this data before making any decisions regarding her loan or servicing," id. ¶ 161; and (3) "to correctly apply underwriting standards to the financial information assembled on [her] behalf and to communicate any decisions made in an accurate and timely manner," id. ¶ 162.  CMI argues that it is entitled to summary judgment on Count III because it owed Pruden no duty of care beyond the terms of the mortgage contract.  Pruden attempts to stave off summary judgment by relying upon the doctrine of negligence per se and the existence of a directive promulgated by HAMP that requires participating mortgage servicers to enter into a Servicer Participation Agreement ("SPA") with HAMP that requires them to "perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed (servicing) operation."  Pl.'s Mem. of Law (doc. no. 47-25) 18.  CMI has the better argument.

"The elements of a claim for negligent infliction of emotional distress ["NIED"] include: '(1) causal negligence of the defendant; (2) foreseeability; and (3) serious mental and emotional harm accompanied by objective physical symptoms.'"

Tessier v. Rockefeller, 162 N.H. 324, 342 (2011) (quoting

O'Donnell v. HCA Health Servs. of N.H., Inc., 152 N.H. 608, 611

(2005)).  Moreover, "a claim for NIED, like any other negligence

claim, demands the existence of a duty [running] from the

defendant the plaintiff."  Moore, 848 F. Supp. 2d at 135

(quoting BK v. N.H. Dep't of Health & Human Servs., 814 F. Supp.

2d 59, 72 (D.H.H. 2011)).  Finally, "[w]hether a duty exists in

a particular case is a question of law."  Coan v. N.H. Dep't of

Envtl. Servs., 161 N.H. 1, 8 (2010) (citing Hungerford v. Jones,

143 N.H. 208, 211 (1998)).

        In Moore, Judge Laplante dismissed a negligence claim

brought by borrowers against their lender and/or loan servicer

because the borrowers had not established any duty running from

the defendants to them.  See 828 F. Supp. 2d at 133-34.  Along

the way toward reaching that decision, Judge Laplante: (1)

pointed out that a borrower's contractual relationship with his

lender would typically preclude recovery in tort, see id. at 133

(citing Wyle v. Lees, 162 N.H. 406, 409-10 (2011)); (2)

identified two common-law duties that the New Hampshire Supreme

Court has imposed on lenders, see Moore, 848 F. Supp. 2d at 133

(citing Lash v. Cheshire Cnty. Sav. Bank, Inc., 124 N.H. 435,

438-39 (1984) and Murphy v. Fin. Dev. Corp., 126 N.H. 536, 541

(1985), neither of which is implicated here; and (3) explained

that when a borrower attempts to establish a duty running to it

from a lender, "[t]he burden is on the borrower, seeking to

impose liability, to prove the lender's voluntary assumption of

activities beyond those traditionally associated with the normal

role of a money lender," Moore, 848 F. Supp. 2d at 133 (quoting

Seymour v. N.H. Sav. Bank, 131 N.H. 753, 759 (1989)).  As to the

Moore plaintiffs' burden to establish that defendants undertook

activities beyond those of a money lender, Judge Laplante had

this to say:

> As to the mortgagees, note-holders, and their loan
> servicers named as defendants here — MERS, Saxon,
> Ocwen, Deutsche Bank, and the Morgan Stanley
> Defendants — the Moores have not alleged facts
> demonstrating that any of them [undertook activities
> beyond those of a money lender].  Rather, the acts
> alleged in the complaint relate entirely to those
> defendants' attempts to collect the Moores' mortgage
> debt and to recoup their investment through
> foreclosure, both of which fall squarely within the
> normal role of a lender.  Though the Moores assert
> that Ocwen and Saxon undertook additional duties when
> they entered into their HAMP SPAs with the federal
> government, this argument runs afoul of at least two
> principles of contract law: first, that third parties
> may not enforce a contract absent a clear intent to
> the contrary and second, that harmed parties may not
> pursue tort claims for contractual breaches, see Wyle,
> 162 N.H. at 409-11.  The Moores may not, therefore,
> premise a negligence claim upon an alleged breach of
> the HAMP SPAs.

848 F. Supp. 2d at 133 (internal cross-reference and parallel

citation omitted).

Pruden recognizes that she may not enforce the SPA against

CMI but, rather, argues that she is merely turning to the SPA to

establish the standard of care she was owed.  However, the

standard of care she identifies is a standard of care that applies to activities that "fall squarely within the normal role of a lender," Moore, 848 F. Supp. 2d at 133.  That leaves Pruden high and dry with respect to identifying a duty running from CMI to her that is enforceable in tort.  Absent a common-law duty owed to her, Pruden's claim for negligent infliction of emotional distress fails as a matter of law.

The lack of a tort duty also renders Pruden's reliance upon the doctrine of negligence per se unavailing.  In New Hampshire,

> [w]hen an action exists at common law, the negligence per se doctrine may define the standard of conduct to which a defendant will be held as the conduct required by a particular statute, either instead of or as an alternative to the reasonable person standard.

Mahan v. N.H. Dep't of Admin. Servs., 141 N.H. 747, 754 (1997) (citing Marquay v. Eno, 139 N.H. 708, 713 (1995)).  Leaving aside the fact that Pruden is attempting to draw a standard of care not from a statute, but from an agreement between CMI and HAMP and/or a regulation or directive promulgated by the U.S. Department of the Treasury, there is a more fundamental problem with her reliance upon the doctrine of negligence per se. Negligence per se may be used to establish a standard of care when an action exists at common law, see id., but where, as here, there is no negligence action at common law against a lender for acts undertaken in the normal course of its activities as a lender, there is no need to establish a standard

43

of care for those acts.  Negligence per se may establish the nature of a duty, but cannot establish the existence of a duty. So, to restate, CMI is entitled to judgment as a matter of law on Count III.

### Conclusion

For the reasons detailed above, CMI's motion for summary judgment, document no. 43, is granted as to Counts I and III, and granted in part as to Count II.  Two of the claims in Count II, however, remain on track for trial: (1) the claim under RSA 358-C:3, I(a), based upon the hang-up calls Pruden alleges she received from CMI, and (2) the claim under RSA 358-C:3, X, based upon CMI's attempt to charge Pruden with a delinquency fee on her second-mortgage account.  Finally, CMI has moved to strike Pruden's surreply.  Because the court has relied upon none of the material to which CMI objects in its partial denial of CMI's summary-judgment motion, its motion to strike, document no. 52, is denied as moot.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

May 23, 2014
cc:   Joseph A. Farside, Jr., Esq.
      Donald E. Frechette, Esq.
      Alexander G. Henlin, Esq.
      Scott C. Owens, Esq.
      Peter S. Wright, Jr., Esq.